Frances HUSCH, Plaintiff,

v.

SZABO FOOD SERVICE,
INC., Defendant.

No. 86 C 1703.

United States District Court,
N.D. Illinois, E.D.

June 5, 1987.

Christopher W. Bohlen, Kankakee, Ill., for plaintiff.

Lawrence A. Reich, Lederer, Reich, Sheldon & Connelly, Chicago, Ill., for defendant.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, District Judge.

Frances Husch ("Husch") sues Szabo Food Service, Inc. ("Szabo") for age discrimination in its alleged firing of Husch.[1] At the very threshold, Szabo has challenged the sustainability of this action due to Husch's failure to satisfy the precondition that she must first have resorted to state administrative proceedings.[2] This

---

1. Szabo disputes Husch's claim that she was discharged, given the fact that the person with whom she really dealt (Wayne Burke, then Szabo's Eastern Market Vice President) thought she was quitting to take a job with another company. In any event, because the critical factual issue on the current motion is *where* the allegedly age-discriminatory act took place, this opinion is not required to accept Husch's characterization of that act—instead, this Court is entitled to make factual findings in that respect as well as others (see n. 3).

2. Szabo characterizes that as a "jurisdictional" flaw. That is an inaccurate label; see *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) in the Title VII context, extended to ADEA litigation by *Stearns v. Consolidated Management, Inc.,* 747 F.2d 1105, 1110–11 (7th Cir.1984); and see this Court's opinion in *Settino v. City of Chicago,* 642 F.Supp. 755, 757–58 (N.D.Ill.1986). However,

Court has therefore permitted discovery focusing on that issue—then, with such discovery completed, it has conducted an evidentiary hearing limited to the facts in that respect. For the reasons stated in this memorandum opinion and order, this action is dismissed for Husch's noncompliance with Age Discrimination in Employment Act ("ADEA") § 14(b), 29 U.S.C. § 633(b).

*Facts* [3]

Before this opinion turns to its factual findings, it is important to identify just what is at the focus of the current inquiry. Husch makes essentially the following syllogistic presentation:

    1. Szabo discharged Husch.

    2. Only Michael Cronk ("Cronk"), a Szabo executive at its corporate home offices in Illinois, had the power to discharge Husch.

    3. Therefore the "unlawful practice" —the critical factor for ADEA § 14(b) purposes—must have occurred in Illinois.

Even though Szabo contests Husch's claim that she was discharged (see Szabo Mem. 1 n. 1), it has fallen into the conceptual trap of that characterization—so that Szabo too has concentrated much of its attention on its own lines of authority and tables of organization. As this opinion reflects, however, the real inquiry remains the locus of the alleged discriminatory act, for which purpose the first step in Husch's syllogism is *not* a given fact. Now, then, it becomes

appropriate to review and consider the operative facts in that light.

Husch had been employed by Szabo since the middle 1960s, working throughout most of that period as a training supervisor.[4] Though she lived in Illinois, she had worked in the various regions around the country into which Szabo divided its operations. Husch was not a full-time Szabo employee, responding instead to assignments as needed. Though she testified the informal understanding she tried to implement was for her to work two weeks on and two weeks off, she had in fact worked less than her goal of 26 weeks in the several years preceding her final year with Szabo. In that last year (the 12 months ended December 10, 1982) she worked a total of some 13 weeks, the bulk of that time in Connecticut (part of the Eastern Market or Eastern Region, where she also handled her largest single job), with lesser time spent in California and in Texas.

Szabo's corporate offices were in Oakbrook, Illinois. At the time of the key events involved here, Cronk had been General Manager of Szabo's Business Division and operated out of those corporate headquarters. But according to Szabo's organizational charts admitted into evidence (DX 1 and 1A)—prepared in the regular course of Szabo's business during 1982, wholly independently of Husch's later-filed charges—the lines of reporting and responsibility placed

the categorization of the requirement as jurisdictional or not is irrelevant for current purposes.

**3.** Because the question now before this Court calls for a factual determination, it is essentially akin to a Fed.R.Civ.P. ("Rule") 12(b)(1) motion in that regard, permitting the resolution of conflicting facts. See, in the Rule 12(b)(1) situation, *Western Transportation Co. v. Couzens Warehouse & Distributors, Inc.,* 695 F.2d 1033, 1038 (7th Cir.1982) and this Court's opinion in *Prudential-Bache Securities, Inc. v. Lisle Axis Associates,* 657 F.Supp. 190 (N.D.Ill.1987) and authorities cited there. Such judicial factfinding is much different from the approach under Rule 12(b)(6), which calls for the court to accept all well-pleaded allegations in the Complaint, with all inferences drawn in Husch's favor. What follows, then, are this Court's factual findings, which have taken *all* the hearing testimony into

account. No effort has been made to recite all the conflicting testimony, of course. Though some of the contrary evidence on which Husch relies is indeed mentioned in the course of this opinion, any silence as to other portions should therefore not be misunderstood as an indication that Husch's evidence has been ignored. On the contrary, the stated facts reflect a resolution of all conflicts in the testimony.

**4.** Szabo was a service organization operating employee food service facilities (typically cafeterias) for businesses on a contract basis. Husch would be called in as needed by a particular district manager to help open up a new location or to assist with problems encountered in an existing location. In either case she would provide training for the employees who were to furnish the necessary cafeteria services, and she would also do various other things required to set up or reorganize the operation.

Husch *not* in that kind of relationship with the Oakbrook home office, but rather with the Eastern Region headed by Wayne Burke ("Burke"). During the earlier portion of 1982 (until about April of that year), Husch reported to Regional Vice President Kenneth Van Anglen ("Van Anglen"), who in turn reported to Eastern Region General Manager Burke (DX 1A). Then after a structural reorganization of the Eastern Region, Husch reported to the head of In-unit Marketing Karl Wenzel, who in turn reported to Burke. That meant that during at least the bulk of the year 1982, and certainly in performing most of her work in that year, Husch was under direct supervision within the Eastern Region, operating out of Connecticut. During the shorter periods when Husch worked in other regions, Burke did not understand he had a continuing responsibility to supervise her.

On Husch's own testimony, from the summer of 1982 until she stopped working for Szabo her work was performed exclusively for Burke in Connecticut. During that time she submitted her expense reports to Burke. Cronk never gave her any performance reviews, nor did he call to give Husch job assignments.[5] Whenever Husch went out on a job in the Eastern Region, Burke would explain what was required on the assignment. When the assignment was completed Husch would report to Burke, who would then tell her "I'll get in touch with you when I need you again." Husch's reports would be provided either orally or in writing directly to Burke.

As already reflected, the calls for Husch's services from the different regions had dried up somewhat in 1982. According to Van Anglen Dep. 18, Burke (who in April of that year had succeeded Van Anglen in the Eastern Region that had provided and continued to provide most of Husch's activity) had a somewhat different view from Van Anglen's:

A. [A]s I recall, Mr. Burke felt that any function previously handled by Mrs. Husch prior to his becoming marketing vice president could be handled by those people within the Northeast region group.

Q. Did Mr. Burke tell you this?

A. No. I say that's my understanding. I don't know that he said that direct to me.

Q. Are you saying then that you understood that other people were to do this work aside from Mrs. Husch?

A. There were other people within the Northeast region that he felt were competent to do the type of work she was doing.

In any case, before the last (December 1982) Eastern Region call for Husch's services, she told Burke "that due to her lack of steady work within Szabo she had been looking for other employment" (Burke Dep. 8–9). Then—not long after that December 1982 assignment, most likely in January 1983 (Burke Dep. 9–10):

A. She called asking for fulltime work because she was not getting other work throughout the country and I stated at that time that it would require her to move to the east coast at which time that was not acceptable to her.

Q. Did she state that to you that it was not acceptable?

A. Right.

Q. Did she say anything else at that time about working for someone else?

A. She did mention at that time that she would probably be forced to seek other employment.

Sometime during the same time frame, Husch sought unsuccessfully to reach Cronk (though she now ascribes that to his

5. Husch has sought to make much of the fact that Cronk's secretary apparently performed some level of coordinating function as to job assignments given to Husch by district managers in any of Szabo's various regions, based on their own self-perceived needs (such coordination was obviously needed to avoid a situation in which Husch might possibly be confronted

with conflicting calls for her services from different regions). But Cronk neither authorized nor was aware of such calls, which (according to Husch's own testimony) occurred only some three times during the entire 1982 year. Those asserted secretarial calls, even if credited, do not alter the analysis in this opinion. See also n. 6.

having line supervision over her, it is more likely—and this Court finds—she was looking for the same kind of full-time arrangement Burke had declined to give her). Then she wrote Burke February 14, 1983 (DX 6) asking "if I still have a job." Burke says—and this Court credits his testimony—that he tried unsuccessfully to reach Husch by telephone to respond to her letter.

After the lapse of a few weeks, Husch came unannounced into the Oakbrook corporate office (which, though some miles away from Husch's Illinois residence, was still within driving distance for her). Cronk was away, so his secretary told Szabo's Director of Operating Systems John Zillmer ("Zillmer") Husch was in the outer office. Zillmer, wholly unfamiliar with the matter,[6] reached Cronk by phone and was instructed by him to find out the situation by talking with Burke, and then to meet with Husch. Zillmer did call Burke while Husch was still waiting in the outer office, then conferred with Husch. Zillmer told her (accurately) Burke had told him about Husch's having asked for full-time work, but that Burke did not have such work available to her unless she was willing to relocate. Zillmer concluded by saying that Husch should communicate either with Burke or with Cronk as to what other work might be available to her within Szabo. Shortly after that (on March 14, 1983) Burke wrote Husch the letter (DX 7) attached to this memorandum opinion and order.

Burke's version of these events, as indeed the entire Szabo perception of Husch's claimed "termination," is supported by the Employee Record Form (PX 1) prepared in the regular course of Szabo's operations.[7] Of the 31 causes for termination listed on that form (including "lack of work," as well as numerous kinds of misconduct and other reasons), the box checked was that specifying a "Voluntary" termination. And the relevant questions on the form after the cause of termination had been so designated were filled out this way:

(62) Was employee offered another job?

_X_ Yes ___ No

(63) Would Re-Hire?

_X_ Yes ___ No

So much, then, for the relevant evidence regarding what Husch now labels her discriminatory "termination." And what of Cronk's place (if any) in the sequence of events—which Husch perceives as controlling? At no time did Cronk give Husch any salary review. Recommendations for her salary increases came from Van Anglen (in his capacity as Eastern Regional Vice President) during his tenure as Husch's immediate superior (before that latter responsibility was transferred to Burke). Cronk's testimony that he never told Van Anglen that he (Cronk) supervised

---

6. Burke Dep. 7 reflects his recollection that Zillmer had handled scheduling of Husch's assignments out of the home office. But it appears most likely, and this Court finds, that recollection was simply in error. That was certainly an understandable mistake on Burke's part, given the facts that (1) Burke's deposition was taken in April 1987, (2) Burke had left Szabo a full three years earlier (Burke Dep. 4) and (3) Zillmer *did* at one point schedule people from the marketing corporate office to work in the field for Burke—but that scheduling began only in *1983*, following a reorganization of the company under which the marketing department became Zillmer's responsibility (Zillmer Tr. 74). That, of course, took place after Husch had already ceased to work for Szabo. During the time period relevant to this case, by contrast, Zillmer was Szabo's Director of Operating Systems (Zillmer Tr. 40), in which capacity his only contact with training supervisors such as Husch was that his department sent them materials (*id.* at 68). Before their five-minute meeting in February or March 1983, Zillmer had never met Husch and had never spoken to her on the telephone (*id.* at 68, 71, 72). At that point Zillmer had no knowledge of who supervised Husch (*id.* at 72) or when or where she was working (*id.* at 74). Certainly he had no supervisory authority over her (*id.* at 77) and had no authority to discharge her (*id.* at 74).

7. Such forms are prepared, often well after the terminating event, to complete Szabo's internal corporate documentation on personnel actions. They are not required to be prepared by the decisionmaker—instead, anyone at the home office (where such records are kept) has the authority to fill out the forms based on his or her understanding of the situation (which may often be second- or third-hand).

Husch or that Husch reported to Cronk was credible, and this Court so finds.[8]

But what is most critical here is that this Court finds no evidence Cronk did *anything* in connection with Husch's employment, even though he might technically have had the power to do so. This Court finds neither Cronk nor anyone else in the corporate headquarters took any adverse action as to Husch. As Burke's testimony put it, though he did not perceive himself as having any authority to terminate Husch altogether (Dep. 15–16) and had no intention of doing so (*id.* at 12), he did have the authority to stop using her services completely (*id.* at 8). That is really what happened, though Burke understood it had taken place by Husch's choice (and not his own), after he had told her that full-time employment was not in the cards. Whatever alleged age discrimination may have taken place,[9] then, it occurred either in Burke's refusal to grant Husch full-time employment when she requested it or in his March 14, 1983 letter.

Indeed, until the matter of just where the discriminatory action had occurred became critical for current purposes, Husch herself took the latter view. When Husch filed her charge with the Illinois Department of Human Resources ("IDHR"), she asserted a single act of discrimination: Burke's March 14, 1983 letter, which she labeled as a discriminatory discharge. After completing its investigation, IDHR dismissed Husch's charge because of lack of jurisdiction, based on these findings by its staff (DX 3):

> The Complainant resides in Creal Springs, Illinois. The Respondent's "home office" is located in Oak Brook, Illinois. However, the Complainant admits that she did not perform services for remuneration within Illinois within 180 days of the filing of this charge.

The Complainant further admits that during this time period, she worked in the State of Connecticut under the supervision of Mr. Wayne Burke, Vice President of Respondent's Eastern Market, (who does not work in Illinois).

Staff recommends that because Complainant, although employed by Respondent, never performed services for remuneration within Illinois, the Department lacks jurisdiction to investigate this charge.

Husch's request for review was denied by a final order of dismissal. Husch did not appeal to the state courts as she could have done, instead filing her Complaint in this District Court. Complaint ¶ 6 specified the identical March 14, 1983 Burke letter as Szabo's assertedly age-discriminatory action.

*Administrative Precondition to Suit*

ADEA § 14(b) requires the victim of "an alleged unlawful practice occurring in a State which has a law prohibiting discrimination in employment because of age and establishing or authorizing a State authority to grant or seek relief from such discriminatory practice" (a "deferral state") to pursue that remedy *before* coming into federal court. According to Husch's own administrative and judicial filings, that state had to be Connecticut—whence Burke's March 14, 1983 letter had emanated. And Connecticut, like Illinois, is a deferral state to which ADEA § 14(b) applies. But as already stated, Husch filed her administrative complaint not in Connecticut but in Illinois.

*Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 754–58, 99 S.Ct. 2066, 2070–73, 60 L.Ed.2d 609 (1979) teaches an aggrieved employee *must* resort to state administra-

---

8. This Court does not credit Van Anglen's Dep. 18–19 testimony to the extent it indicates otherwise. As Van Anglen's Dep. 9–10 reflects, Van Anglen's understanding was an assumption based on his perception of how he obtained Husch's services (Van Anglen Dep. 7 said the need for Husch's services would be determined by any of the district managers, and then the schedule would be cleared with Cronk's secretary—see n. 5). In any case, at the relevant time for current purposes Burke had already supplanted Van Anglen in the Szabo organizational structure. It was then Burke who decided whether or not Husch's services were needed (Van Anglen Dep. 19–20).

9. No finding of such discrimination is made or implied here. To that extent, Husch's characterization of Szabo's discriminatory intent is simply assumed arguendo.

tive remedies (assuming a deferral state is involved) as a prelude to suit under ADEA. Because such state proceedings are mandatory and not optional under *Oscar Mayer*, a filing in the *wrong* state is just as much a failure to satisfy the ADEA § 14(b) statutory precondition as no filing at all. As *Cornett v. Avco Financial Services*, 792 F.2d 447 (4th Cir.1986) put it (dealing with an alleged act of discrimination occurring in West Virginia, while the state charge had been filed in California):

> The district court correctly applied the substantive rule of *Oscar Mayer* in holding that the commencement of state proceedings requirement of § 633(b) is mandatory and not optional; that it mandated for Cornett commencement of state proceedings in West Virginia; and that Cornett's failure so to proceed legally barred this action.

Accord, *DePriest v. Seaway Food Town, Inc.*, 543 F.Supp. 1355, 1359–60 (E.D.Mich. 1982) (an extended discussion based on *Oscar Mayer* and stating in part, "Filing in the wrong state deprives the court of jurisdiction just as much as failure to file at all with an available state agency").

In ADEA § 14(b) terms, the alleged unlawful practice occurred in Connecticut and not Illinois.[10] That means this suit could not be brought "before the expiration of sixty days after proceedings had been commenced under the State law [of Connecticut, not Illinois.]" Because Husch has not complied with that requirement, Szabo's motion to dismiss must be and is granted. This action is dismissed.

---

**10.** Had the allegedly discriminatory act taken place in Illinois, a convoluted legal question might have had to be dealt with. Because Husch did not appeal the IDHR administrative decision to the Illinois state courts, issue preclusion does not apply to any *findings of fact* by IDHR (*Duggan v. Board of Education of East Chicago Heights*, 818 F.2d 1291 (7th Cir.1987)). But what IDHR decided was at least in part a question of law rather than fact: It determined that the meaning of the Illinois statute (Ill.Rev. Stat. ch. 68, ¶ 2–101(A)(1), which defines "employee" to mean "[a]ny individual performing services for remuneration within this State for an employer") was that the *services*, and not merely the payment of compensation, must

have taken place in Illinois for IDHR to take jurisdiction. Under those circumstances Illinois would not be a "deferral state" as to Husch at all within ADEA § 14(b), because the Illinois state authority did not have the power to "grant ... relief from such discriminatory practice" that occurred in Illinois—the assumed firing—with respect to an employee who had never "perform[ed] services for remuneration within this State [of Illinois]." If that were so, Husch would not have had the obligation to pursue the (nonexistent) Illinois state remedy as a precondition to suing under ADEA. That puzzling prospect need not be faced, however, given the findings in this opinion.

---

DEFENDANT'S EXHIBIT 7

**Wayne F. Burke**
Vice President
Eastern Market

March 14, 1983

Mrs. Frances Husch
Route 1, Box 87
Creal Springs, Illinois 62922

Dear Fran:

I have received your letter of February 14, 1983, and have been unable to contact you by phone.

Today, I spoke to John Zillner who informed me that he had met with you recently in Oakbrook and informed you that we were unable to provide the amount of work you needed for your living costs. I apologize that the Company has been remiss in not informing you sooner of these circumstances.

On behalf of us on the east coast, we have valued the expertise that you have shown in the past years.

Best of luck to you in your new ventures. Please do not hesitate to contact me if I may be of assistance.

Sincerely,
SZABO FOOD SERVICE COMPANY
/s/Wayne F. Burke
Wayne F. Burke
Vice President, Eastern Market

WFB/lm